## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RONALD MANGUM** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | **Civil No. PJM 06-1283** |
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

## <u>MEMORANDUM OPINION</u>

This is a personal injury case in which Plaintiff Ronald Mangum originally sued an individual defendant, Stacie Kane, for negligence when she practiced a "take down maneuver" that she had learned in her FBI training class on him while they were at her home.  The United States filed a certification that Kane was acting within the scope of her employment at the time of the incident and the Court substituted the United States as Defendant.  Defendant United States then filed a Motion to Dismiss for lack of subject-matter jurisdiction because Mangum had failed to exhaust administrative remedies under the Federal Tort Claims Act and because the U.S. had not waived its sovereign immunity.  Mangum responded to the Motion to Dismiss by twice seeking leave to amend his Complaint.

On December 20, 2006, the Court *sua sponte* reconsidered its order substituting the United States as Defendant based on a belated recognition that the events at issue took place at Kane's home.  The Court denied without prejudice the then-pending Motion to Dismiss and Motion for Leave to Amend the Complaint and granted Mangum the right to take discovery relative to the issue of whether Kane was acting within the scope of her employment at the time of the alleged incident.

1

Discovery has been completed and Mangum has filed a Motion to Vacate the Court's Order substituting the United States as Defendant. The United States opposes. No hearing is necessary to dispose of this matter. See Local Rule 105.6 (D. Md. 2006). Having considered the pleadings, the Court will DENY Mangum's Motion to Vacate.

## I.

FBI Special Agent Stacie Kane became an employee of the FBI in September 2003, at which time she began a 16-week agent training course in Quantico, Virginia. As part of the course, Kane was required to take a defensive tactics class and pass a final test on all learned maneuvers. After instructing trainees on the take-down maneuver at issue in this case, FBI defensive tactics instructor, Special Agent John Wills, directed the trainees, including Kane, to practice the maneuvers on any consenting individual, because continuous practice was essential to becoming proficient. The United States has submitted evidence that these instructions were consistent with the expectations of FBI senior management at Quantico. Indeed, the FBI made available certain training equipment for trainees to practice with at home. Kane understood Wills' instructions to mean that she should practice outside class on any consenting participant. Other students similarly understood the instruction to mean that practice should not be limited to other trainees, but could be performed on consenting civilians as well. Indeed, the United States has submitted five affidavits of other trainees who received Wills' instruction and practiced various maneuvers on their friends and family during breaks in the training course.

Mangum and Kane began a romantic relationship in June of 2003. After her training began, Kane spent weekdays training in Quantico, but returned to her apartment in Ellicot City on the weekends. The facts that led up to the performance of the maneuver on Mangum do not appear to

be in serious dispute.  The couple was sitting in Kane's living room, on her futon, over the weekend, talking about the training that she had learned at Quantico the prior week.  Kane asked to show the take-down maneuver to Mangum, who agreed.  They both got up off the futon and she began the maneuver.  According to Mangum, he told her he only wanted her to *show* him the maneuver, not to actually *perform* it.  There is evidence in the record that Mangum provided some resistance to the maneuver in order to simulate what a real "bad guy" might do if Kane were performing the maneuver.

## II.

Under 28 U.S.C. § 2679(d)(1), upon certification of scope employment by the Attorney General, any civil action commenced "shall be deemed an action against the United States."  However, certification is merely "the first, but not the final word" on whether the federal employee is immune from suit and whether the United States is properly substituted.  *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995).  The burden of persuasion rests with the plaintiff to disprove the validity of the certification and to establish by a preponderance of the evidence that the defendant was not acting within the scope of her employment.  *Maron v. United States*, 126 F.3d 317, 323 (4th Cir. 1997).  Although the certification is not conclusive on the matter of scope of employment, it does satisfy the Government's prima facie burden.  *Id.*  If the plaintiff presents persuasive evidence refuting the certification, the burden then shifts to the United States to provide evidence and analysis to support its conclusion.  *Gutierrez de Martinez v. DEA*, 111 F.3d 1148, 1155 (4th Cir. 1997).  Here, Mangum must submit specific evidence that contravenes the certification decision.  Speculation is not enough.  *Id.*

### III.

Under Maryland law, the general test for determining whether an employee's alleged tortious acts were within the scope of employment is whether the acts were in furtherance of the employer's business and were authorized by the employer. *Sawyer v. Humphries*, 322 Md. 247, 255 (1991). "Authorized" does not mean authority expressly conferred, but rather "whether the act was such as was incident to the performance of the duties entrusted to him by the master." *Hopkins Chem. Co. v. Read Drug & Chem. Co.,* 124 Md. 210 (1914). Maryland courts have considered the following factors, set forth in the Restatement of Agency: (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; © previous relations between the master and the servant; (d) the extent to which the master's business is apportioned between different servants; (e) whether the act is outside the enterprise of the master; (f) whether the master has any reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether the instrumentality by which the harm is done has been furnished by the master; (I) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether the act committed is criminal. *Sawyer,* 322 Md. at 256 (quoting Restatement of Agency § 229).

### IV.

Mangum argues that Kane was not acting within the scope of her FBI employment at the time she performed the maneuver because the act was performed during non-work hours, while the couple was relaxing at home. Mangum emphasizes that they were "kidding around" and that they never discussed the prospect of Kane "practicing" the maneuver or took any precautions for her to do. Instead, Mangum argues that the agreement between the couple was simply that Kane would

"show" the maneuver to him.  In addition, Mangum asserts that Wills, the FBI instructor, did not affirmatively instruct the trainees to practice the maneuver on civilians.  The Government responds that Mangum has failed to establish that Kane's acts were a departure from the instructions provided by Wills, arguing that Wills told Kane and all other members of her class to practice on their own time.  The trainees understood this instruction to mean that they should practice whenever they could, on anyone who would consent.

While initially troubled that the incident at issue in this case occurred at Kane's private residence during non-work hours, the Court now finds the Government's position more persuasive. Applying the *Sawyer v. Humphries* test, the Court concludes that Kane's conduct was specifically authorized by Wills and her attempt to practice was in furtherance of the FBI's goal that trainees be properly prepared by the end of the training course.  Wills testified at deposition that he told his class that they should practice the maneuvers whenever they could, whether visiting family, at home or elsewhere.  The evidence shows that on the night of the incident, Kane and Magnum had discussed what Kane had been learning during her training program that week and further that they agreed, at a minimum, that she would "show" him the maneuver.  Whether Mangum misunderstood what was about to take place, it is clear that Kane was attempting to practice the new technique she had learned, as per Wills' instruction.

Mangum's argument that because Wills didn't explicitly instruct the trainees to practice "at home," Kane contravened his instructions by doing so is not compelling.  The absence of a restriction on when and where the trainees could perform the maneuver does not mean that they were expressly *not allowed* to perform it at home on friends and family.  It is evident that Wills' intention was - and Kane's understanding was - that Kane and her classmates were to practice the

maneuver whenever they could, even at home.  Wills' instruction thus constitutes a direct authorization for Kane's behavior such that substitution of the United States is warranted.

Given that Wills' directive to practice as much as possible expressly authorized Kane's conduct, an analysis of the Restatement § 229 factors is not, strictly speaking, necessary.  However, a Restatement analysis also reveals Kane's conduct to have been within the scope of her employment.  Of the factors applicable to these circumstances, the following becomes clear:  The act of practicing was commonly done by the trainees (Subsection (a)), the act was not outside the enterprise of the FBI and was one that Wills expected to be done (Subsections (e)-(f)), the act was similar in quality to the practice maneuver that was authorized and was not criminal (Subsections (g), (I), (j)) and the instrumentality (in the form of knowledge) was provided by the employer (Subsection (h)).  The only factor that would counsel hesitation under the Restatement analysis is Subsection (b), namely, "the time, place and purpose of the act."

Under the Restatement, conduct is within the scope of employment if it is "of the kind the servant is employed to perform and . . . occur[s] during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and [is] actuated at least in part by a purpose to serve the master."  Restatement of Agency § 228.  In considering this factor then, the Court considers whether the time and place - on the weekend and at Kane's home - is "unreasonably disconnected" or "unreasonably distant" from the authorized area.  The Court has already made a finding that it was Wills' expectation that the maneuver would be practiced at home during non-work hours; thus, the location and time of the act is not unreasonably disconnected from his instruction.  Moreover, many courts have found that after-hours conduct under similar circumstances is within the ambit of an employee's duty.  *See, e.g., Thompson*

*v. United States*, 504 F. Supp. 1087 (D. S.D. 1980) (police trainee who accidentally killed bystander practicing his "fast draw" move was acting within the scope of employment); *Moore v. Family Serv.,* 237 S.E.2d 84 (S.C. 1977) (injuries sustained while carrying heavy books arose out of course of employment where employer told her to take books home); *Albert v. Farm Bureau Ins. Co.,* 916 So. 2d 1238 (La. App. 2005) (deputy sheriff acted within scope of employment when he injured another deputy practicing a defense tactic).

Ultimately, Wills' instruction that the trainees should practice the take-down maneuver as much as possible is sufficient to overcome the otherwise unusual fact that the incident took place during non-work hours.  As such, Mangum has not met his burden in rebutting the certification provided by the Attorney General.

## V.

For the foregoing reasons, the Motion to Vacate by Plaintiff Mangum [Paper No. 34] is DENIED.  The Government's Motion to Dismiss is hereby RENEWED.  Mangum shall have 30 days to respond to the Government's Motion.  A separate order will be ENTERED.

_____
/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

June 13, 2007